# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| LISA UPAH,<br><br>      Plaintiff,<br><br>vs.<br><br>MERCY MEDICAL CENTER,<br><br>      Defendant. | No. 18-CV-63-CJW-KEM<br><br>**ORDER** |

This matter is before the Court on Mercy Medical Center's ("defendant") Motion for Summary Judgment. (Doc. 11). Lisa Upah ("plaintiff") timely filed her resistance (Doc. 12), and defendant timely filed a reply (Doc. 18). For the following reasons, the Court **grants** defendant's Motion for Summary Judgment on all three claims.

## I.  BACKGROUND

Plaintiff worked as a credentialing coordinator at Mercy Medical Center from July 5, 2016, through January 17, 2017. (Docs. 11-2, at 1; 12-1, at 1). Before her employment at Mercy Medical Center, plaintiff had worked in the healthcare industry for twenty years and had worked as a credentialing coordinator at her previous places of employment. (Doc. 11-3, at 6-7). While working at Mercy Medical Center, plaintiff alleges that she experienced stress and anxiety as a result of the workload and treatment by her supervisors. (Doc. 12-2, at 1). Plaintiff felt that she was required to work overtime to complete tasks necessary to her role. (*Id.*). Plaintiff's supervisor, Bev Dawson, "was very adamant that overtime was not allowed, that it was not budgeted, there was zero tolerance for it." (Docs. 11-3, at 47; 16, at 1). Plaintiff and Ms. Dawson exchanged multiple emails regarding plaintiff's time entry practices when plaintiff worked unapproved overtime, and instances when plaintiff needed Ms. Dawson to adjust

plaintiff's time card to add unreported overtime. (Doc. 11-3, at 77-82, 84-87).

To alleviate some of the "stress and anxiety" that plaintiff asserts she felt due to her job, plaintiff requested that another employee take over some of her job duties. (Doc. 12-1, at 2). Ms. Dawson denied that request. (Docs. 11-2, at 2; 12-1, at 2). Ms. Dawson also offered to find plaintiff a role elsewhere at Mercy Medical Center, which plaintiff declined. (Doc. 11-3, at 83; doc. 2, at 5).

On September 23, 2016, plaintiff met with Ms. Dawson to discuss multiple challenges that she was experiencing in the workplace. (Docs. 11-2, at 1-2; 12-1, at 1-2). Following the conversation, Ms. Dawson sent an email "summarizing the meeting and offering solutions to help [p]laintiff perform her job satisfactorily." (Docs. 11-2, at 2; 12-2, at 2; *see also* 11-3, at 93-94). On October 21, 2016, plaintiff received a 90-day performance review in which she received "needs improvement" ratings for the Competencies, Resource Utilization/Financial Management/Productivity, and Leadership categories. (Doc. 11-3, at 88-89). For the other categories in the performance review—Service Excellence, Quality Improvement, Continuous Learning, House Orientation, and Initial Orientation—plaintiff's performance was found to be "satisfactory." (*Id.*). The evaluation also indicated that additional orientation was needed. (*Id.*, at 89).

Plaintiff claims that her relationship with Ms. Dawson and other Mercy staff continued to deteriorate over the next few months, from November into December. (Doc. 2, at 6; doc. 11-3, at 20). Plaintiff saw her family doctor on December 16, 2016, who diagnosed plaintiff with anxiety and prescribed her medication. (Docs. 12-2, at 2, 16; 11-3, at 48). Subsequently, plaintiff scheduled an employee assistance program (EAP) appointment at Mercy Medical Center. (Docs. 11-2, at 3; 12-1, at 3; 16, at 3). On December 21, 2016, plaintiff spoke with Carla Schulz, MD, a doctor at Mercy Medical Center, and Nancy Hill-Davis, a human resources specialist at Mercy Medical Center, about perceived harassment by Ms. Dawson, the stress plaintiff alleged she was

experiencing, and what plaintiff contended were perceived Health Insurance Portability and Accountability Act ("HIPAA") violations by Ms. Dawson. (Docs. 12-2, at 1-2; 16, at 1-3). The same day that plaintiff met with Ms. Hill-Davis and Dr. Schulz, Ms. Dawson sent an email to Ms. Hill-Davis stating that plaintiff's "performance ha[d] actually been declining" since the first 90-day review and seeking guidance on how to proceed if plaintiff did "not pass her second probationary period." (Doc. 11-3, at 83).

The events that plaintiff contends violated HIPAA included a conversation between Ms. Dawson and Lisa Brandt—another Mercy Medical Center employee—in which Ms. Dawson generally "sp[oke] poorly" of a doctor's character, and a separate conversation when Ms. Dawson commented to plaintiff about a doctor still living with his mother. (Doc. 11-3, at 23-25). Plaintiff concedes that she did not hear Ms. Dawson comment on medical conditions of any patients or physicians. (Docs. 11-3, at 24; 12-1, at 4).

At the same December 21, 2016 meeting, plaintiff told Dr. Schulz and Ms. Hill-Davis that plaintiff had not been paid for sixteen overtime hours that she had worked the weekend of December 18 and 19, 2016.[1] (Doc. 11-3, at 26-27). After Dr. Schulz and Ms. Hill-Davis were informed of the unreported overtime hours, defendant paid plaintiff for the sixteen hours of overtime. (*Id.*). Although Ms. Dawson told plaintiff multiple times that the budget did not allow for overtime, it appears defendant paid plaintiff for all overtime hours she reported. (Doc. 11-3, at 79-82, 84-86, 95). Plaintiff continues to claim that some of her overtime hours were not paid by defendant, but plaintiff cannot provide an estimate of how many hours went unpaid, and she does not have documentation of the extra hours. (Docs. 11-3, at 26; 12-2, at 3).

Plaintiff was terminated from her position on January 17, 2017, and plaintiff filed

---

[1] The Court notes that December 19, 2016, was a Monday and would not normally be considered a "weekend." The Court finds this discrepancy to be immaterial for purposes of summary judgment.

a report with the Iowa Civil Rights Commission on January 19, 2017 ("ICRC"). (Docs. 2, at 3-4; 2-1, at 8-15). When plaintiff first filed her report, she did not indicate that she believed she had been discriminated against based on a disability, though she did note that she was diagnosed with anxiety. (Doc. 11-3, at 20). After submitting the report, an ICRC representative called plaintiff, and informed plaintiff that anxiety was considered a disability. (Doc. 11-3, at 20). The representative asked plaintiff if she wanted to change her response on the ICRC report to indicate that plaintiff did believe she had been discriminated against based on a disability. (*Id.*; *see also* Docs. 1-1, at 59; 2-1, at 9). Plaintiff stated she would like to change her answer, so the representative modified the form. (Doc. 11-3, at 20-21).

Plaintiff then requested an administrative release to sue in state court, which was granted by the ICRC. (Doc. 1-1, at 66). Plaintiff filed a complaint in the Iowa District Court for Linn County on November 22, 2017. (Doc. 1-1, at 51-57). After plaintiff amended her complaint to add a Fair Labor Standards Act ("FLSA") claim (Doc. 2), defendant filed a notice of removal to this Court under Title 28, United States Code, Sections 1331 and 1441(a) (Doc. 1). On December 31, 2018, defendant filed its motion for summary judgment on all counts. (Doc. 11).

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A court should address both whether there is a genuine issue, and whether the issue concerns a material fact. The Eighth Circuit Court of Appeals has noted "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (citation omitted). The United States Supreme Court has held, however, that when "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

When considering a motion for summary judgment, a court must view all the facts "in the light most favorable to the party opposing the motion." *Matushita.*, 475 U.S. at 587 (1986) (citation omitted). The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party must then offer "specific facts showing that there is a genuine issue" that goes beyond "metaphysical doubt as to the material facts." *Matushita*, 475 U.S. at 586-87 (emphasis omitted) (citing FED. R. CIV. P. 56(e)).

### III. ANALYSIS

#### A. *FLSA Claim*

The Fair Labor Standards Act provides that, unless an exemption listed in Title 29, United States Code, Section 213 applies, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment [beyond forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Neither party asserts that plaintiff was an exempt employee, or that an FLSA exemption applies. (*See* Docs. 2, at 7; 5, at 3 (acknowledging that plaintiff "was employed as a non-exempt employee pursuant to the Fair Labor Standards Act, 29 U.S.C. 201, *et. seq.*, and none

of the exemptions contained in 29 USC § 213 apply to Plaintiff.")). The Eighth Circuit Court of Appeals has held that whether an employee "seek[s] overtime pay is irrelevant because [employees] cannot waive [their] entitlement to FLSA benefits." *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997). Although employees retain entitlement to benefits under the FLSA, an employer must have actual or constructive knowledge of unpaid employee work hours to be liable under the FLSA. *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009) ("An employee must be compensated for duties 'before and after scheduled hours . . . if the employer knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity.'" (citing *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975) (omission in original))).

To satisfy the constructive knowledge element, an employer must exercise "reasonable diligence" to determine hours worked by employees. *Shaunpen Zhou v. Int'l Bus. Mach. Corp.*, No. 15-CV-1027-LRR, 2017 WL 1217195, at *17 (N.D. Iowa Mar. 31, 2017) (citing *Hertz*, 566 F.3d at 781). "The FLSA's standard for constructive knowledge in the overtime context is whether the [employer] 'should have known,' not whether it could have known" about additional hours an employee worked. *Hertz*, 566 F.3d at 782 (citation omitted). Ultimately, the plaintiff "has the burden of proving that [plaintiff] performed work for which he was not properly compensated." *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds*).

Plaintiff alleges she was forced to clock out and complete her work on her own time, and that in "failing to compensate [plaintiff] for all hours worked and to pay overtime when due to her," defendant violated the FLSA. (Doc. 2, at 7). Plaintiff admits that she did not use the conventional reporting system to report all of her hours. (Doc. 11-3, at 42-43). Plaintiff also claims, however, that defendant had constructive

knowledge of unreported overtime hours because plaintiff informed Ms. Hill-Davis and Dr. Schultz of her additional work. (11-3, at 46-47). In contrast, defendant asserts that for every instance in which defendant had actual or constructive knowledge of plaintiff's overtime hours, defendant paid plaintiff for the overtime hours worked. (Doc. 11-1, at 12).

With the facts presented, the Court finds that plaintiff has not met her burden; she cannot show defendant's actual or constructive knowledge of unpaid hours. Additionally, although plaintiff alleges defendant had constructive knowledge of unpaid hours, plaintiff's conclusory statement that she worked "more" hours than reported does not give defendant enough information to accurately pay plaintiff. *See Hertz*, 566 F.3d at 783 (noting that the plaintiff bears the burden of showing that "the plaintiff has performed compensable work and . . . [showing] the number of hours for which the plaintiff has not been properly paid."); Doc. 11-3, at 26-27. *See also, e.g.*, *Turner v. Saloon Ltd.*, 595 F.3d 679, 690–91 (7th Cir. 2010) (affirming summary judgment in FLSA case and stating that a plaintiff's mere assertions are insufficient to create a jury issue); *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (affirming summary judgment in FLSA case despite plaintiff's conclusory allegation that she had worked 210 hours of unpaid overtime).

The facts asserted by both parties indicate, first, that plaintiff worked unapproved overtime hours, and, second, that for the instances when defendant had either constructive or actual knowledge of overtime hours, plaintiff was fairly compensated. (Docs. 11-1, at 11-12; 12-1, at 5, 8-9). Defendant consistently either paid plaintiff for the additional weekly hours worked or encouraged plaintiff to report all her hours so that defendant could accurately pay plaintiff. (Doc. 12-1, at 5-9). Plaintiff knew that whenever she completed work she needed to report all of her hours. (Doc. 12-1, at 5). Emails between plaintiff and Ms. Dawson show that Ms. Dawson informed plaintiff multiple times that

plaintiff had to clock extra hours so she could be fully compensated, even when plaintiff had not been approved to work overtime. (Doc. 11-3, at 84 ("As we've previously discussed, you may not work off the clock as your position is non-exempt. I truly appreciate your commitment and efforts to meeting deadlines. But not only is it just ethically wrong for an employee to work without compensation it is also in violation of the organization's policies.")). Further, on some occasions, plaintiff requested that her supervisor extend her hours clocked to accurately reflect overtime, showing that plaintiff understood the policy and that defendant was willing to compensate plaintiff for the hours worked. (Doc. 11-3, at 81-82, 84-86).

Because plaintiff cannot bear her burden of showing that she worked overtime hours other than those that were paid out by the defendant, the Court **grants** summary judgment in favor of the defendant on plaintiff's FSLA claim. *See Holaway*, 771 F.3d at 1060 (affirming summary judgment in favor of the employer because the plaintiff "failed to meet even the relaxed evidentiary standard because he failed to put forward any evidence of the amount and extent of his work in excess of forty hours.").

### B. *Disability Discrimination Claim*

Plaintiff further claims that she had a qualifying disability, which was a motivating factor in her termination and for which defendant failed to provide reasonable accommodations, in violation of the Iowa Civil Rights Act. (Doc. 2, at 4-6); *see* IOWA CODE § 216.6 (2016). Under Iowa law, to prevail on a disability discrimination case premised on a disparate treatment theory, a plaintiff has the burden to establish a *prima facie* case that "(1) he or she [was] a disabled person; (2) he or she [was] qualified to perform the job, with or without an accommodation; and (3) he or she suffered an adverse employment decision because of the disability." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) (footnote omitted) (citing *Schlitzer v. Univ. of Iowa Hosp. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002)).

Because the Court finds the second element to be dispositive, the Court will not consider the first issue, presuming that plaintiff was disabled. The Court finds that plaintiff cannot satisfy the second element of her disability discrimination claim. To show that she was qualified to perform the job, plaintiff must satisfy a two-part inquiry. First, plaintiff must show that she could "perform the essential functions of the job," or those functions that "bear more than a marginal relationship to the job at issue." *Goodpaster v. Schwan's Home Serv.*, 849 N.W.2d 1, 14 (Iowa 2014) (quoting *Boelman v. Manson State Bank*, 522 N.W. 2d 73, 80 (Iowa 1994)). "This inquiry must consider [t]he nature and extent of a disability, the needs of a particular job, and the impact of disability on a person's ability to perform that job." *Id.* (alteration in original) (citations and internal quotation marks omitted). Second, plaintiff must show that a reasonable accommodation would have enabled her to perform the essential functions of the job. *Id.* at 16-17. Plaintiff has the burden of making "a facial showing that [a] reasonable accommodation was possible." *Id.* at 17 (citation omitted). "This showing is not an onerous one and requires no more of the employee than to propose an accommodation and present testimony of its feasibility." *Id.* at 17.

Under the second inquiry, plaintiff must show that the assistance she requested was reasonable and possible to implement without compromising the essential duties of the role. *Id.* The primary accommodation proposed by plaintiff was a reassignment of aspects of her job to other employees. (Docs. 2, at 2; 11-3, at 14). The Iowa Supreme Court has unequivocally rejected the reasonableness of plaintiff's proposed accommodation:

> Any accommodation that places the burden of a job on other employees to perform the function assigned to the [plaintiff] substantially impinges on the rights of other employees and is therefore unreasonable. Disability discrimination law does not require an employer to change the "essential elements" of the job in order to accommodate a [plaintiff].

9

*Schlitzer*, 641 N.W.2d at 532 (citations omitted). The aspect of plaintiff's job that caused her the most anxiety, the workload, could not be modified without changing the nature of her role, which would be unreasonable. The essential functions of plaintiff's role included a variety of clerical tasks connected to credentialing, maintaining files and databases for practitioners and staff, and providing coordination and support to staff when needed. (*See* Doc. 11-3, at 73) (For example, plaintiff's duties included "act[ing] as a resource for physicians and staff regarding credentialing," "maintain[ing] practitioner databases," serving as a back up to the Executive Assistant and Medical Staff Coordinator, conducting initial reviews of requests for doctor's privileges, etc.). The majority of plaintiff's work included clerical tasks and taking meeting minutes, which were essential functions of her job. Plaintiff's request that these "essential elements" of her job be reassigned to her coworker would have shifted "the burden of [plaintiff's] job" to another employee, which would be unreasonable. *Schlitzer*, 641 N.W.2d at 532. The Court thus concludes that it was not improper or unlawful under the Iowa Civil Rights Act for the defendant to decline to provide plaintiff with her requested accommodation.

Plaintiff further claims that she requested additional training as an accommodation. (Doc. 2, at 5). Plaintiff received the training she requested and also received additional instructions from her manager, without a change in her performance. (*See* Doc. 11-3, at 61, 83, 93-94). Thus, this accommodation was unavailing, and plaintiff cannot show that she was able to perform her job with this accommodation. Finally, defendant suggested finding plaintiff a different, more manageable role within Mercy Medical Center as an accommodation. (*See id.*, at 83). Reassignment could have been a reasonable accommodation, depending upon the comparable aspects of the two roles. *See Blackford*, 661 N.W.2d at 521. Plaintiff rejected this solution, however, stating that she wished only to continue in her current position. (*See id.*).

Similar to the federal process under the ADA, Iowa law requires that the employer and employee engage in an interactive process to identify reasonable accommodations. *Deeds v. City of Marion*, 914 N.W.2d 330, 343 (Iowa 2018) ("In [*Blackford*], we recognized the need for an employer and employee to engage in the interactive process to determine a reasonable accommodation."). Iowa law requires that an employer "make 'a reasonable effort' to accommodate an employee's disability." *Courtney v. Am. Nat'l Can Co.,* 537 N.W.2d 681, 687 (Iowa 1995) (quoting *Cerro Gordo Cnty. Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 197 (Iowa 1987)). Although the parties did not find a solution, defendant did regularly work with plaintiff to attempt to make her job more manageable, even without knowledge of her alleged disability. (Doc. 11-3, at 83, 94). Defendant was not informed of plaintiff's disability until the middle of December, well after issues with plaintiff's performance had arisen and plaintiff's manager had tried to assist plaintiff in performing the functions of her job. (Doc. 11-3, at 16-17). When defendant finally had knowledge of plaintiff's disability, reasonable methods of assisting plaintiff had already been discussed in an interactive way between plaintiff and Ms. Dawson.

The factual record shows that plaintiff and Ms. Dawson engaged in an interactive manner to help the plaintiff manage her job, that plaintiff rejected a reasonable accommodation offered by defendant and that plaintiff's requested accommodation was *un*reasonable. Ultimately, plaintiff is unable to show that "she [was qualified to perform the job, with or without an accommodation." *Blackford*, 661 N.W.2d at 519. Without one of the elements under the test in *Blackford* and based upon the material facts before the Court, plaintiff cannot prove a *prima facie* disability discrimination case under the Iowa Civil Rights Act. Thus, the Court **grants** summary judgment in favor of the defendant on plaintiff's state law disability discrimination claim.

### C. Wrongful Discharge Claim

Finally, plaintiff claims that she was wrongfully discharged against public policy because she "engaged in legally protected activity by reporting inappropriate behavior and violations of company policy to [Human Resources], including violations of law such as HIPAA." (Doc. 2, at 6). Under Iowa law, to prevail on a claim of wrongful discharge, a plaintiff must show:

> (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) there was no overriding business justification for the termination.

*Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009) (citations omitted). The Court finds summary judgment is appropriate on this claim under the second element because the undisputed facts could not support a finding that plaintiff's discharge would jeopardize public policy.

As to the first element, plaintiff's claim for wrongful discharge partially rests on a vague, unspecified company policy, and partially on a perceived violation of HIPAA.[2] (Docs. 2, at 6; 12, at 3). Although reporting violations of statutes, such as HIPAA, normally falls within "clearly defined public policy that protects employee activity," reporting "violations of company policy" do not. *Id.* at 762 ("In each case we have decided since adopting the public-policy exception to the employment-at-will doctrine, we have relied on a statute as a source of public policy to support the tort. At the same time, we have consistently rejected claims of wrongful discharge based on public policy when the public policy asserted by an employee was not derived from a statute." (internal citations omitted)). The claimed internal company policies simply do not constitute a

---

[2] Although plaintiff alleges her claim is based on reporting violations of law "such as HIPAA" (Doc. 2, at 6), plaintiff has not identified any other alleged law violations she allegedly reported.

12

public policy interest under Iowa law. Iowa courts "do not divine public policy from internal company policies or agreements," such as policies governing behavior at Mercy Medical Center as asserted by the plaintiff. *Dorschkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303 (Iowa 2013); (Doc. 2, at 6). Thus, plaintiff's claim for wrongful discharge cannot succeed as a matter of law under plaintiff's theory of violated company rules.

Although reporting potential HIPAA violations would generally be a protected activity, plaintiff's reported violation was outside the realm of what anyone would reasonably consider to be a HIPAA violation. HIPAA protects patient records and patient protected health information. 45 C.F.R. §§ 160.103, 164.502 (defining "health information" and proscribing prohibitions on disclosing protected health information, respectively). The conversation which plaintiff reported that she believed constituted a HIPAA violation included only criticism of medical personnel and comments about a doctor's personal life. (Doc. 11-3, at 24-25). Plaintiff acknowledges that no medical information was disclosed or mentioned, and that the interaction she witnessed included only her supervisor speaking poorly of doctors and directors. (*Id.*). Plaintiff's own testimony shows that no medical or patient information was disclosed, nor was there a claim that patient records or protected health information was impermissibly released, discussed or shared. (Doc. 11-3, at 25-26). Plaintiff testified that she has worked in the healthcare industry, specifically with medical providers and doctors, for more than twenty years. (*Id.*, at 6-7). A person who spent twenty years in the healthcare industry, even a person without intricate knowledge of HIPAA, would not reasonably conclude that colleagues discussing a doctor's personal life violates HIPAA.

Under the second element, for plaintiff to prevail on this claim, plaintiff must "show [that] the conduct engaged in not only furthered the public policy, but [that] dismissal would have a chilling effect on the public policy by discouraging the conduct."

*Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 284 (Iowa 2000). Generally, when a plaintiff internally reports a violation of law, the act of reporting is protected activity as a matter of public policy, regardless of whether the allegations are later proved correct. *See Dorschkind*, 835 N.W.2d at 306 ("[Plaintiff's] conduct involved . . . reporting what she believed were two coworkers forging state-mandated training documents . . . . Such an act advances a clear public policy."); *see also id.* (noting that "whether the employee makes the complaint internally or externally does not change the public-policy considerations of our state"); *Bussing v. COR Clearing*, 20 F. Supp. 3d 719, 733 (D. Neb. 2014) ("Internal reporting may also prevent simple misunderstandings—where an employee is mistaken, and there has been no legal violation—from transforming into investigations that waste corporate and government resources.").

Iowa courts examine the effect that dismissal of an employee would have on other employees. If a plaintiff can show that her discharge after engaging in protected activity "will discourage other employees from engaging in the same conduct, then public policy is undermined." *Dorschkind*, 835 N.W.2d at 306 (citing *Fitzgerald,* 613 N.W.2d at 282). As the Iowa Supreme Court has noted, "if a public policy exists, but is not jeopardized by the discharge, the cause of action must fail." *Fitzgerald*, 613 N.W.2d at 284. Further, "[t]his element guarantees an employer's personnel management decisions will not be challenged unless the public policy is genuinely threatened." *Id.* Here, because plaintiff's allegation of a HIPAA violation was specious, her dismissal by defendant would have no material impact on public policy. An unreasonable allegation by an employee that an employer has violated the law would not dissuade other employees from reporting meritorious allegations.

Similarly, under federal whistleblower statutes, even when an employee incorrectly reports violations or misconduct against his or her employer, the employee is protected if the employee "in good faith believes and a reasonable employee in the same

14

or similar circumstances as the plaintiff might believe that the employer is possibly committing [a violation of law]." *Mahony v. Universal Pediatric Servs., Inc.*, 753 F. Supp. 2d 839, 846-47 (S.D. Iowa 2010) (citing *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 567 (8th Cir. 2004)). If the claim is inaccurate, yet reasonable, providing protections for the reporting employee furthers public policy by ensuring that would-be whistleblowers who have meritorious reports are not intimidated. *Id.* Claims that are patently unreasonable, however, do not carry the same public policy implications because the risk of discouraging future, reasonable whistleblowers is low. Here, a reasonable employee in the same or similar circumstances as the plaintiff would not believe that the employer possibly committed a HIPAA violation.

Because a reasonable jury could not find that reporting personal, non-medical comments about co-workers is a protected activity for the sake of public policy under HIPAA, summary judgment is **granted** in favor of defendant on plaintiff's wrongful discharge claim.

## IV. CONCLUSION

In light of the foregoing, the Court finds that defendant is entitled to judgment as a matter of law on plaintiff's FLSA, wrongful discharge, and disability discrimination claims. When taken together, the Court's decision amounts to a complete grant of summary judgment. Defendant's Motion for Summary Judgment (Doc. 11) is **granted** as to all claims.

**IT IS SO ORDERED** this 8th day of April, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa